HASTORF v. O'BRIEN et al.

(Circuit Court of Appeals, Second Circuit. July 21, 1909.)

No. 278.

SHIPPING (§ 54*)—BAILEE FOR HIRE OF SCOW—LIABILITY FOR INJURY OF VESSEL.

> Bailees for hire of a scow, bound to exercise ordinary care to protect her from injury, are not liable for her injury by being pierced by a timber standing upright in the bottom under her, where she lay while being unloaded, where the place had been dredged and swept for obstructions but a month before by the city, and where their own vessel, which was larger, had safely lain in the same position only five days before.

> [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219, 220; Dec. Dig. § 54.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Action by Albert H. Hastorf, as owner of the scow Arcadia, against Henry O'Brien and others, as bailees for injury to the scow. Decree for libelant, and respondents appeal. Reversed.

The libelant is the owner of the scow Arcadia, which in January, 1907, was chartered to the respondents and was used by them to carry stone to a contractor who was constructing new ferry slips at Thirty-Ninth street, Brooklyn. On January 3, 1907, the respondents loaded the scow with rip-rap at Manhattan, and she was thereupon towed to the Brooklyn work. When she reached there she was taken through an open space into an inclosure surrounded by piling where a crib was being sunk by putting stone in it. Some rip-rap had already been put in, and the stone which composed the scow's cargo was partially unloaded into the crib. Before she was wholly unloaded, however, the scow listed and soon sank. Subsequent examination showed that the cause of the sinking was the penetration of a timber which was imbedded in the bottom of the river in a nearly upright position. This timber had pierced the bottom of the scow and had gone through as far as her deck. It was sawed off and the scow later repaired. The ferryboats in going in and out passed close to where the scow lay, and their suction was sufficient to draw her down about a foot.

The respondents made no examination of the bottom before placing the scow alongside the crib. The place where she lay, however, had been newly dredged, and the bottom had been swept for obstructions by an engineer of the city dock department about a month before the accident. No obstructions were found at this place. A few days before the accident another scow of the respondents, the Whitelight, loaded with stone for the crib, had been moored by them in substantially the same place where the Arcadia was when injured. This scow was larger than the Arcadia, remained there under substantially the same conditions as existed in her case, and suffered no injury.

The District Court held that the respondents had failed to establish their freedom from negligence and rendered a decree for the libelant.

Foley, Martin & Nelson, for appellants.

James J. Macklin (De Lagnel Berier, of counsel), for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). The respondents were bailees for hire of the scow and were bound to use ordinary care in operating her. They were not insurers and were not obliged to adopt every known means to guard against accident. They were only required to take such precautions as, under all the circumstances, a reasonably prudent person would have taken.

Now in this case what precautions ought the respondents to have taken to guard against the accident which occurred? And this involves the further inquiry: What precautions could they have taken? Had the timber been imbedded in the bottom before the scow was towed there, its presence could have been discovered by employing divers to search the bottom. So the bottom might have been swept in the manner of the engineers of the dock department. But these were extraordinary precautions, which, under the circumstances, we think the charterers of a scow used in this class of work were not required to take. In our opinion they did their full duty when they sent the scow only to a place where their own vessel had lain in safety under similar conditions but a few days before. As men of ordinary prudence they might well have concluded that a place was safe for their chartered

boat in which their own larger vessel had been moored for the same purpose and had sustained no injury.

But it is said that they failed to guard against the possibility of the timber being imbedded in the bottom between December 29th, when the Whitelight was there, and January 3d, when the accident occurred, as well as the possibility of the timber floating under the vessel in an upright position after she was moored. We think, however, that ordinary care did not require them to apprehend these improbable happenings. Extraordinary, and not ordinary, care alone would have guarded against them. In our opinion, the respondents as bailees for hire showed that they failed in the performance of no duty which they owed the libelant.

The decree of the District Court is reversed, with costs, and the cause remanded, with instructions to dismiss the libel, with costs.

NOTE.—The following is the opinion of Adams, District Judge, in the court below:

ADAMS, District Judge. This action was brought by the owner of the scow Arcadia to recover for damages received in the forenoon of January 4, 1907, at a wharf then under construction at 39th Street, South Brooklyn.

The libel alleges that the employé of the respondent hauled the scow Arcadia into an opening made in the dock running from the foot of 39th Street, that this opening separated the said dock, making two parts of the same, the dock was undergoing repairs by the respondent, that the cargo of stone laden on said scow being for filling in the crib work; that at the time of hauling the scow into the place it was high water and that on the falling of the tide on or about the 4th day of January, in the afternoon of said day, the scow took a list to port and it was subsequently ascertained that a plank broke through the bottom of the scow, resulting in the scow taking the list, causing her to leak and settle on the bottom; that during the said times the scow was under charter of the respondent, under agreement with the libellant, and that said respondent agreed to return the boat at the expiration of the charter in the same condition as received.

And the libel also alleges that the plank or timber that broke through the bottom of the scow was a part of the old dock imbedded in the bottom and left by the respondent in the gap made by them in the said dock and opening where the scow was hauled by the employés and servants of the respondent.

The defense is; that the respondent admits that on or about the 3rd of January, 1907, at the foot of 55th Street, North River, the respondent loaded some stone on board the scow Arcadia, but they deny that they completed the loading of a cargo of stone on the scow Arcadia. They admit said scow was towed to the foot of 39th Street, Brooklyn, by the tug Henry O'Brien—and it has been proved here that was one of the respondent's boats. They admit the scow was brought into the crib at the foot of 39th Street.

Respondent alleges as a separate defense, that the respondents were engaged in the building of new ferry racks and cribs at the foot of 39th Street, East River, and that at the time the crib had been sunk the respondents were engaged in filling the crib; that in the work the scow Arcadia was employed to convey a load of rip-rap from 55th Street to 39th Street, where the respondent was carrying on the said work; that on the 3rd day of January, 1907, the respondent was placing rip-rap on the scow and when a portion of the same had been loaded the captain of the scow refused to permit any more rip-rap or cargo to be placed on said scow because it was then in a leaky condition and unfit to receive any further cargo; that at the time and for some time prior thereto the said scow was rotten, old and leaky and unseaworthy; that thereupon the said scow was brought with such portion of her cargo as she had on to 39th Street, and upon reaching there efforts were made to promptly unload her; that a rain storm came up while the unloading was going on and the unloading was interrupted; that while the scow lay in the crib at 39th

Street she took in such a quantity of water that she sank; that the sinking was caused without any fault, neglect or want of care on the part of the respondent, but was caused solely through the old, rotten, leaky and unseaworthy condition of the said scow; that the place where the scow sank was a good and safe berth, free from all obstructions of every kind.

I think we ought first to dispose of the claim of unseaworthiness. It has been argued here on the part of the respondent that the unseaworthiness, even if it existed, was not contributory to the sinking. The testimony, however, satisfies me that the boat—although old and somewhat the worse for wear and perhaps incapable of carrying a full cargo—was on this occasion quite capable of carrying the cargo that was loaded on her. She did carry it safely to 39th Street, where she was placed in the crib. There does not appear to have been any undue leakage on her part on the way over. Some hours after it was discovered she was leaking. What was the cause for this leaking? It turned out from the examination of the diver—who went there a few days after the boat sank—that the bottom was filled with wreckage. Perhaps I should qualify that somewhat. He did not say it was absolutely filled, but that he found a piece of wreckage—a scantling of timber, 8x12—embedded in the bottom there and projecting upward and that the scow had set on this piece of timber and a hole had been broken through her bottom through which the timber extended up so that it rested against her deck. This scow was what is known as a deck scow, that is, she did not carry anything in her hold, but carried all her cargo on deck. The diver, when he went down had to encounter obstacles under the deck put there for the purpose of strengthening the scow and he was very persistent and managed to go to the place of injury, where he found this plank protruding through the bottom and up against the deck. I have no doubt whatever that that was the cause of the boat sinking, and the only thing that is troubling me in the case is whether the respondent was in any way negligent, thereby causing the boat to sink.

Of course as bailees for hire the respondent was under a duty to take at least ordinary care of the scow and in order to make them responsible it is necessary that some negligence appears on their part. That is the real question in this case. Were they, or were they not, negligent in sending the boat to that place?

The Circuit Court of Appeals (Johan Swenson v. Snare & Triest Company. 160 Fed. 459, 87 C. C. A. 443) has recently said, in a case of this kind:

"It is admitted that the pile driver was chartered by the respondent from the libellant and that while in the exclusive possession of the respondent it sank and was lost. As such an occurrence is not in the ordinary course of things, the burden was thrown on the respondent as a bailee to show how the loss took place and that it was not caused by its negligence. * * *

"The District Judge heard the witnesses. He had an opportunity to note their appearance and behavior upon the stand. He has found that the evidence showed negligence upon the part of the respondent. We need not go so far. It is sufficient for us to say that we have carefully examined the whole record and, in view of the findings of the trial court, are unable to hold that the respondent has sustained the burden of proof imposed upon it by law."

It appears here that the respondent sent its own boats there and one of the boats the same size as the Arcadia had lain in practically the same place without receiving any injury; that it was a boat which drew about the same water and that she remained there through all stages of the tide and she had received no injury whatever.

I have no doubt the Arcadia was lying in such a way that in ordinary circumstances when there was no special commotion of the water, she would not have touched this obstruction, although she would probably have been quite near it. The testimony shows that the ferryboats going into and out of their slips in that vicinity—partly at the end of the slip at this time on the south side of the wharf which was about 1,200 or 1,500 feet long up to the place of the opening where the scow was injured—created a great suction so that the water was removed from underneath the boats, I think the witnesses say, about a foot; causing the boats to settle a foot lower than they would otherwise have done. Now I think that was the cause of this accident. This other scow belonging to the respondent which had lain in the same place could not

have met these same conditions or she might not have passed through the experience without injury. The Arcadia was, apparently, in whatever suction took place there brought down so that her bottom rested upon the obstruction which I have already described and which doubtless made a hole in her so that this piece of plank ran into her bottom and created a serious opening causing her almost immediately to take in water enough to sink her.

It remains to be determined, now, whether the O'Briens should have anticipated such a state of affairs as that. They were bound to take ordinary care of this boat and bound not to take her into a place where she would be subjected to any extraordinary stress or danger. It seems to me that they should have known that the effect of the commotion caused there by the ferryboats would be to lower the scow considerably in the water, at least as much as a foot, and that they ought to have taken that into consideration, what she would meet with under such circumstances. It has been testified here that the place was dredged out and that no obstructions were found, but as I recall the testimony that was done by the City and not at the expense of the respondent. I do not think, however, even if these parties who did the dredging had been the agents of the respondent that the respondent would be relieved by that dredging, if they were otherwise liable, because the man who testified about it really did not know what was taking place there. It seems to me if there had been any such dredging as the witness for the City seemed to indicate there had been, this obstruction would have been discovered. It must have been there for some little time, it was embedded in the sand; whether that embedding was caused by the weight of the boat or something else, it is impossible to tell. Quite likely the weight of the boat resting on the obstruction did push it down into the sand—although sand is not such a material as yields to anything of that kind as readily as mud would. I believe that was the cause of this accident, that no precautions were taken by the respondent to ascertain what the scow Arcadia would meet with when she was subjected to the effect of the ferryboat swells and it seems to me that in that respect they were negligent. They should have known what the effect of those swells would be upon the scow and in failing to ascertain that, they were guilty of negligence, such negligence as ought to make them responsible for the effects of this accident.

I therefore direct that a decree be entered for libellant against the respondents with an order of reference.